THE EDWARD SMITH NO. 2.

THE MASABA.

(District Court, N. D. Ohio, E. D.   January 18, 1901.)

No. 2,257.

COLLISION—MEETING STEAMER AND TOW—CROWDING BY OVERTAKING STEAMER.
Evidence considered in a suit for collision between an ore-laden barge in tow passing down through the dredged channel in Lake St. Clair and the meeting steamer, Edward Smith No. 2, and *held* to establish that the collision was due to fault in the officers and crew of the Smith in failing to properly navigate their vessel, which was permitted to sheer after passing the tug, and swing across the course of the tow, breaking her cable, and also to the fault of the Masaba, an overtaking steamer, which was attempting to pass the Smith without having signaled her intention, and in violation of the rules governing navigation in the channel.

In Admiralty.

Harvey D. Goulder, for libelants.
John C. Shaw, for respondent the Smith.
H. W. Kelley and C. E. Kremer, for respondent the Masaba.

RICKS, District Judge.   On a bright July day, in 1898, on the main waterway from Detroit northward, there might have been seen a fleet of steamers, some with tows and some without, some passing light up through the dredged channel in Lake St. Clair and others passing down loaded, all converging upon the dredged canal and passageway, which is provided by artificial aid for vessels engaged in commerce on the lakes.   In this bright daylight a collision occurred by which a steamer was sunk, and the controversy we have before us is to determine who was responsible for the wrong and injury done.

The libel, filed on January 4, 1899, briefly recites the claim of the libelants as to who was responsible for the collision.   This libel states that John Corrigan and William T. Carrington were the sole owners of the barge Aurania; that the said barge and the steamers Edward Smith No. 2 and Masaba were and are each maritime vessels of the United States, engaged in the business of commerce and navigation upon the public and navigable waters of the United States.   The libel further alleges that on the 24th day of July, 1898, said barge Aurania, in tow of the steamer Aurora, upon a wire cable which had been shortened up to a length of 600 feet or thereabouts, was engaged in the prosecution of a voyage from Duluth to Ashtabula, laden with a cargo of iron ore, and that, proceeding down the St. Clair Flats Canal, said tow met and passed, under port signals, an up-bound tow near the lower end of the dikes, and so passed well to starboard out into the dredged channel which forms the approach to the channel between the dikes, and in which a descending tow can neither stop nor turn around; that, after so passing out into the dredged channel, they met and passed an up-bound steamer under port signals, when the said steamer Edward Smith No. 2 and the said steamer Masaba, approaching from below, and

bound up through the canal, exchanged with the Aurora signals of one blast; that the course of the Aurora and Aurania was so directed as to keep the tow well on the starboard side, in a proper place under the circumstances, and, as they were thus in all respects lawfully navigating the canal, leaving more than two-thirds of the channel on their port hand, the Smith came up on a course to pass the tow at a safe distance, when, a short distance only ahead, and on the port bow of the Aurora, in a proper position for passing the tow, the Masaba being then close on the starboard side of the Smith, and both steamers coming up rapidly, the Smith sheered slightly to port in consequence, as libelants are informed and believe and therefore allege, of the close proximity and the suction of the Masaba, moving in the same direction with her; that the Aurania, to make sure of allowing as full room as the steamer towing her, ported and headed slightly above her steamer. The Smith recovered, and passed the Aurora at a safe distance for vessels proceeding in opposite directions, and after she had gotten entirely past the Aurora, and was about to pass the Aurania at a safe distance, the Masaba still being close to the starboard side of the Smith, the stern of the Smith seemed drawn over towards the Masaba's stern, and the Smith suddenly and violently sheered, and swung to port across the bow of the Aurania. The Aurania's helm was hard ported, and the Aurora's engine was stopped, and the lever controlling the towing machine on the Aurora released so that the cable might reel out, there being no time or opportunity to let go the line on either vessel; but so extreme and rapid was the sheer of the Smith that she struck the towline at nearly a right angle, about 100 feet ahead of the Aurania, parted the wire cable, and then swung around the bow of the Aurania, which struck the Smith on the starboard quarter. The vessels came together with great force, driving the bow of the Aurania to port, and straightening the Smith up the channel, so damaged that she filled and sank after going a short distance, while the Aurania, with bows badly stove, forged and drifted diagonally down and across the channel, until she brought up on the bottom, aided in this by a stern anchor, which she had let go. The libelants further allege that they are ignorant of the definite positions of these vessels relative to each other before the passing signals were exchanged, but are informed, and therefore allege, that the Masaba, which was a large, powerful steamer, with one barge in tow, both without cargo, had been astern of the Smith, which was loaded, and had overhauled the Smith, and was attempting to pass her, in which she unlawfully persisted after the vessels had entered the improved channel of the approach below the dikes comprising part of the canal, by reason whereof the vessels entered in double line, and that afterwards, while attempting to pass, she negligently drew in so close to the Smith as to interfere with the steering of that vessel, and cause her to sheer. The libelants say, in respect to the Smith, that they are ignorant of what occurred on board of her, and whether all was done which might have been done to avoid or overcome the sheering caused by the Masaba, and have no positive knowledge that the Masaba was the overtaking and passing

vessel; and aver that the Smith, after having established an agreement with the Aurora to pass that steamer and her tow port to port, not only swung from her course, but ran through the towline and across the bow of the Aurania, and in so doing came into collision, inflicting great damage on her; and libelants charge that said vessels were in violation of the rules established by the secretary of war, under authority of an act of congress, for the use and navigation of the St. Clair Flats Ship Canal, which comprises the dikes, the water between the dikes, and the improved channels of approach, both above and below the dikes, wherein, by rule 5, it is provided that all persons in charge of, or employed upon, vessels or boats, are forbidden to enter the canal two or more abreast; to pass another vessel or boat while going in the same direction in the canal; to follow another vessel or boat at a distance of less than 500 feet, except when in tow; to pass the canal in more than one line going each way; or to pass the canal at a rate of speed exceeding eight miles per hour. And, aside from the violations of the rules, libelants charge that the Masaba was in fault:

"(1) In having in charge of her officers who were reckless and negligent; (2) in having no proper lookout; (3) in persisting in her effort to overhaul and pass the Smith in that place and under the circumstances; (4) in going so close to the Smith as to interfere with her steering and in causing her to sheer."

Libelants further charge that the Smith was in fault in the following particulars:

"(1) That her officers then and there in charge of her were negligent; (2) that she left her course, and ran across the bow of the Aurania, in violation of the agreement established by the one-blast signals exchanged; (3) that she ran across the bow of the Aurania and into collision with her."

The libelants further say that, by reason of the said collision, the said barge Aurania was greatly damaged.

The claim and answer of the owners of the steamer Edward Smith No. 2 states that the said steamer was bound on a voyage from the port of Buffalo to the port of Duluth, laden with a cargo; that, crossing Lake St. Clair in the afternoon of the 24th day of July, 1898, the said steamer Smith was being followed and overtaken by the large steamer Masaba, towing the barge Manda on a long line astern; that the Masaba did not signal any intention of passing the Smith, and the latter continued on, at her ordinary full running speed, while crossing the lake, and on the usual course for the St. Clair Flats Canal; that, upon approaching the head of the lake, the Masaba pulled out, and started to pass on the starboard hand of the Smith. Claimants further say that, as the Masaba came up abreast of the Smith, she came in closer to the latter, on a course somewhat converging with the Smith's course; that, when her bow was thus abreast of the Smith, it was apparent that, as the vessels were then going, the Smith must enter the canal abreast of the tow. Thereupon, it being apparent that the Smith could not get ahead of the Masaba, which continued going at an apparently full speed, the Smith's engine was checked, in an endeavor to drop behind the tow. Right after the Smith checked, the steamer Aurora,

with the barge Aurania in tow, which was then below the piers coming down, blew a signal of one whistle to the Masaba and Smith, and the latter vessels each responded with one blast. Thereafter the Masaba crowded over towards the Smith, and the latter was kept off to port, and checked a second time to as slow an engine speed as she could take and maintain steerageway; but the Masaba seemed to draw her along and pass very slowly, and, as the Aurora and Smith were about to meet and pass, the suction of the Masaba caused the Smith to sheer to port, and towards the Aurora, and she was rung up full speed under a hard a-port wheel to break such sheer, and avoid a collision with the Aurora. The Smith recovered from this sheer, and passed the Aurora safely to port, but with both vessels well on the westerly side of the channel, and with the Masaba close on the Smith's starboard hand, and about in the center of the channel. The Smith was again checked, as soon as she was steadied, but was rung up as she started on another sheer to port, and against a hard-over wheel; but her stern seemed to be drawn right around by the Masaba, so that she was thrown crosswise of the channel ahead of the Aurania, and the latter vessel, coming on, struck her stem on, on the starboard side, causing her to sink on the westerly side, and near the lower entrance, of the dredged channel leading up to the canal. Claimants deny all charges of fault made against the Edward Smith No. 2, and aver that they violated no rules governing the use and navigation of the St. Clair Flats Ship Canal, and aver that they had the right of way, and that the Masaba only is chargeable with fault for overtaking and approaching the canal abreast of the Smith. The claimants allege that the Masaba was at fault in the following particulars:

"(1) In not having a proper and sufficient lookout; (2) in that her officers were careless and inattentive to their duties; (3) in that she attempted to overhaul and pass the Smith without any agreement by signals; (4) in that, upon getting abreast of the Smith, she proceeded in her endeavor to pass, although she could not then possibly get her long tow ahead of the Smith, except by passing her in the narrow waters of the canal, contrary to the rules governing the same; (5) in that, upon the approach of the down-bound tow, she did not drop astern of the Smith until they should have passed the down-bound tow and gotten through the canal; (6) in that, having agreed by signals with the Aurania to pass port to port, she crowded upon the course of the Smith so that the latter could neither drop back of her long tow nor be steered safely between the two tows, where the wrongful actions of the Masaba had placed her, and where she was caused by suction to sheer over and into collision with the Aurania; (7) in that she undertook to enter the cut at an excessive and unlawful rate of speed."

The claimants of the steamer Edward Smith No. 2, on the 2d day of January, 1900, filed an intervening libel against the steamer Masaba, alleging negligence, and claiming damages against the Masaba.

The Minnesota Steamship Company, owner of the steamer Masaba, filed an answer on April 7, 1900, to the libel of John Corrigan and William T. Carrington, owners of the barge Aurania, in which they admit the collision above referred to, but deny that they were coming up rapidly, or were so close on the starboard side of the Smith, or that the Smith's stern was or could have been drawn towards

the stern of the Masaba, or that the Masaba in any manner interfered with the navigation of the Smith. They deny that the Masaba was, at the time of the occurrence mentioned, attempting to pass the Smith. On the contrary, they allege that the Masaba had overtaken and passed the Smith on Lake St. Clair, miles below the scene of the collision. They deny that they drew in so close to the Smith as to interfere with the steering of the vessel, causing her to sheer; and allege, on the contrary, that the Masaba was far over to the eastward and ahead of the Smith at the time the latter vessel went off to port. They deny that the Masaba caused, or contributed to, the movement of the Smith to port, or was guilty of any violation of the rules established by the secretary of war; and allege that the Smith was in fault, (1) in that she had no sufficient lookout; (2) in that her officers then and there in charge of her were negligent, and inattentive to their duties; (3) in that she left her course and ran across the bow of the Aurania, in violation of the rules of navigation; (4) in that she ran across the bow of the Aurania, and into collision with her; (5) in that she was negligently steered and managed at and before the time when she left her course; (6) in that she failed to stop and back her engines. They further allege that the Masaba was pursuing a course further to the eastward than usual, in order to give ample room to all vessels in the vicinity, and that she was wholly without fault or negligence in the matters referred to in the libel. The said Minnesota Steamship Company, owner of the said steamer Masaba, also filed, on May 8, 1900, a claim and answer to the intervening libel of the owners of the steamer Edward Smith No. 2, in which they make substantially the same allegations as those above recited.

After the testimony had all been presented, proctors for the Masaba and the Smith both consented that the record should show that each one conceded that the Aurora and Aurania were not in fault.

One of the most important facts to be determined in this case is at what point the Masaba passed the Smith before the collision occurred. I think the preponderance of evidence shows that the Masaba had not passed the Smith in the open lake, but that she came up to and attempted to pass the Smith about the time the downbound tow met them. The evidence shows that had the Smith been properly navigated, and kept her course, which took her safely by the Aurora, she and the Masaba would both have passed the downcoming tow in safety.

Another important question of fact, to be settled from the testimony of witnesses who saw the collision, is as to the distance between the Smith and the Masaba at the time the former took her sheer. It is important to ascertain this fact correctly, if possible, because the claim of the Smith is that the Masaba, in undertaking to pass her, came so near to her that the Smith felt the force of suction from the Masaba. It is further contended by the Smith that the Masaba was not only at the proper distance from the Smith to put into motion this mysterious power of suction, and to do it at such a point as would give that force the greatest power, but that she actually did this. If the Masaba was from 300 to 700 feet from

the Smith, the weight of the opinion of the experts and the experienced sailors is that the force of the suction would not reach the Smith with sufficient power to change her course or put her beyond the control of her wheel and engine. It is contended on behalf of the Smith that the weight of testimony shows that the Masaba was not too far away to bring this power of suction to bear.

Witnesses for the Smith testify that the Smith was only 40 or 50 feet from the Aurora, and from 50 to 60 feet from the Masaba. Other witnesses testify substantially as follows: Donaldson, captain of the Aurora, testifies that the Smith was 100 feet from the Aurora, and the Masaba 25 or 30 feet from the Smith. The engineer of the Aurora says that the Smith was 200 feet from the Aurora, and the Masaba closer. The mate of the Aurora says the Smith and Masaba were 100 feet apart. The wheelman of the Aurora says the Smith and Aurora were 100 feet, and the Masaba looked 15 or 20, but was probably more. The captain of the Aurania says the Masaba was only 50 feet from the Smith, and the Aurora and Smith 100 feet apart, but the Masaba was within 50 feet of the Smith. The mate of the Aurania says the Smith and Masaba were 50 to 100 feet apart, and the Smith and Aurora 75 or 100.

In contradiction, witnesses for the respondents say substantially as follows: The captain of the Masaba says that the Smith and Masaba were 600 to 700 feet apart. Thompson, fireman of the Masaba, says that the Aurora and Masaba were 300 feet apart. The captain of the Manda says the Smith was 300 or 400 feet off, and the mate also puts it the same.

I conclude that there must have been more space between the Smith and the Aurora and the Smith and the Masaba than 50 or 60 feet, because, as the proctor for the Masaba forcibly stated, the length of the Smith was 214 feet, and she could not have taken a sheer, and turned herself at an angle that shut her in between the Aurora and the Aurania in the space of 100 or 120 feet when her own length was double that amount. These opinions of the witnesses were quoted by counsel, and have been verified, and found to be correct.

It is but just that I should say, in this connection, that, appreciating the importance of determining correctly the distance between the Masaba and the Smith before the collision, Mr. Kelley, proctor for the Masaba, brought into court several photographs, taken to demonstrate the exact distance between these two vessels. It was contended by the proctor for the Smith that these photographs were not accurate, because there was no sufficient testimony to show that the lenses were all of the same power; because of this uncertainty, that accuracy as to distance as claimed could not be admitted.

Whether the proximity of these vessels was such as to cause suction sufficient to influence the course of the Smith or not, I am of the opinion that the Masaba was in fault, and contributed to some extent to the collision of the Smith and the Aurania, in this, to wit: That as she gradually lessened the distance between herself and the Smith, as she came up the lake on her usual course and at her usual speed, she must have observed, or should have observed, that

the Smith was not expecting her to attempt to pass her with her tow at that unfavorable place in the dredged channel leading to the canal, which was clearly against the rules of navigation. It must be remembered that the Masaba was the overtaking vessel. She was the faster vessel, and was sailing at her usual speed, which her master says was about 10 miles per hour in the open lake. Being in the rear, he could, without any difficulty, watch the progress the Smith was making, and, as they both approached the lower end of the dike where this collision occurred, he had better opportunities for observing the probability of their meeting between the dikes or somewhere in the channel. He knew that the tow would necessarily interfere with the free handling of the vessels, and make it more difficult for them to pass, either between the dikes or in the dredged channel. The rules required him to avoid meeting there if he could, and his own sound judgment ought to have warned him against such an unnecessary danger. If he saw that, proceeding under the rules and the agreement between the Smith and the Aurora, he was likely to meet the Smith in the dredged channel, or between the dikes at a point of unnecessary danger, he could have sounded an alarm to the Smith, and secured some agreement as to which of them should check and fall behind, so as to go through the channel and canal in single file instead of two abreast. The master of the Masaba admits that he did not sound the whistle, or give any signal that he was intending to overtake and pass the Smith, which was clearly in violation of the rule. The master of the Masaba says that he supposed the Smith was cognizant of what he was doing, both as to speed and course, as they were in sight of each other for several hours; and his proctor justifies him by saying that there was no duty resting on the Masaba to notify the Smith of her approach, when the latter had seen the Masaba in the Detroit river, and knew she was following. The preponderance of evidence shows that time enough had transpired to indicate clearly to the master of the Masaba that the Smith was not expecting him to pass her at that point, as heretofore stated. Now, whether there was a violation of the rules or not, the master of the Masaba is put in the position, in this case, by his own testimony and that of other witnesses, of having deliberately undertaken to pass the Smith, without giving her warning, in a channel which, under ordinary circumstances, might have been wide enough for all the vessels to pass, as they undertook to do. It looks very much to me as though the Masaba was undertaking to force her way through the channel and canal, without regard to the possibility, or, to put it stronger, probability, of doing some damage to the smaller vessel she was overtaking; and I cannot refrain from saying, at the close of this collision case, that I am again impressed with the great importance of care in the management of vessels on these lakes. The rivalry between boats for quick dispatch is so great that their masters are willing to take great risks in speeding their vessels to suit the demands of owners. There seems to be a mad rush for a cargo, and then a wild run for the goal. A few puffs of steam, and a little manual exercise at the wheel, intelligently used, would have avoided

this collision, and would have saved all the money lost, and all the trouble and expense of this litigation. Experimenting as to how close vessels can safely pass is instructive, but often dangerous and expensive. It is only by the rigorous enforcement of the rules of navigation that this dangerous rivalry shall be cured, and a conservative and wiser handling of vessels follow.

My conclusion, from all the testimony, is that the officers and crew of the Edward Smith No. 2 were in fault in not properly navigating their vessel, and not anticipating the sheer, which might have been avoided, or the force of which might have been greatly lessened, by a prompt handling of the wheel and proper signals to the engineer. The fault of the Masaba lay in undertaking to pass the Smith at that unfavorable place, which undoubtedly contributed to, if it did not wholly cause, the sheer of the Smith, as aforesaid. In the conclusions reached as to the facts, it is not necessary to discuss the legal propositions submitted and argued by proctors for both the Smith and the Masaba. I have so stated them that full advantage can be taken if any error has been made. A decree may therefore be drawn in favor of the libelants, awarding them costs and all court expenses, and finding both the Smith and the Masaba in fault, for the reasons heretofore stated, and dividing the damages between them. The case may be referred to H. F. Carleton, as commissioner, for the assessment of the damages.